IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT NORTH CAROLINA
SOUTHERN DIVISION

| | | |
|---|---|---|
| VULCAN ADVANCED MOBILE POWER SYSTEMS, L.L.C., TDF & COAL, INC., ENGENERATION OPERATING SERVICES, L.L.C., and TEXAS MPOWER SYSTEMS, L.L.C., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| V. | ) ) | Case No. 7:06-cv-00108 |
| DANIEL J. O'HARE, MICHAEL R. STEWART, BRENDEN STEWART, MICHAEL GOSSELIN, and H. R. STRATEGIES, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Vulcan Advanced Mobile Power Systems, L.L.C, TDF & Coal, Inc., Texas Mpower, L.L.C. and Engeneration Operating Services, L.L.C. ("Plaintiffs") and collectively complain of Daniel J. O'Hare, Michael R. Stewart, Brenden Stewart, Michael Gosselin and H.R. Strategies ("Defendants") and would respectfully show this Court as follows:

### A. PARTIES

1. Vulcan Advanced Mobile Power Systems, L.L.C. ("Vulcan AMPS") is a Delaware limited liability company with its principal place of business in Elizabethtown, North Carolina.

2. Engeneration Operating Systems, L.L.C. ("Engeneration") is a Texas limited liability company with its principal place of business in Elizabethtown, North Carolina.

3. Texas Mpower, L.L.C. ("Mpower"), is a Texas limited liability company with its principal place of business in Elizabethtown, North Carolina.

4. TDF & Coal, Inc. ("TDF") is a Texas corporation with its principal place of business in Elizabethtown, North Carolina.

5. Daniel J. O'Hare ("O'Hare") is an individual residing in San Antonio, Texas and may be served at 1630 Fauwn Bluff, Apt. 1708, San Antonio, TX 78248-1582, or wherever he may be found.

6. Michael R. Stewart ("Stewart") is an individual residing in Hiawassee, Georgia and may be served at 4819 Itsey Trail, Hiawasee, GA 30546-4881, or wherever he may be found.

7. Defendant Brenden Stewart ("B. Stewart") is an individual residing in Stillwater Oklahoma and may be served at his home address at 3204 Cypress Mill Ave., Stillwater, Okalahoma 74074-1821, or wherever he may be found.

8. Defendant Michael Gosselin ("Gosselin") is an individual residing in Atlanta Georgia and may be served at his home address at 800 E. Morningside Dr. NE, Apt A, Atlanta Georgia 30324-5818, or wherever he may be found.

9. H. R. Strategies ("HRS") is, on information and belief, a Georgia corporation with its principal place of business in Hiawassee, Georgia, but which does business in North Carolina, in particular, HRS does business in Robeson and Bladen Counties, North Carolina. HRS may be served through its CEO, Michael R. Stewart at 4819 Itsey Trail, Hiawasee, GA 30546-4881, or by serving its registered agent, Richard Stancil at 85 S. Main St., Hiawasee, Georgia 30456-3433. If HRS is not a corporation, Plaintiffs believe it is a d/b/a for Michael Stewart.

## B. JURISDICTON AND VENUE

10. Venue is proper pursuant to 28 USC §1391 (a) and (d). This Court also has subject matter jurisdiction over this lawsuit because Plaintiffs assert a breach of the Computer Fraud and

Abuse Act 18 USC §1030 *et seq.* and the Electronic Communications Privacy Act 18 USC §2701 *et seq.* Furthermore, jurisdiction and venue are proper in this Court, as substantially all of the transactions and occurrences that give rise to this lawsuit occurred in North Carolina.

## C. FACTUAL BACKGROUND

11. O'Hare and Stewart are fiduciaries (as former officers, directors and/or members of the board of managers of Vulcan AMPS, TDF, Mpower and Engeneration), who orchestrated a racketeering and corrupt scheme to defraud those entities and their owners. O'Hare held a number of positions at the various entities including CFO of Vulcan AMPS. Stewart, *inter alia*, was a Vice President and head of Human Resources at Vulcan AMPS. During the course of their employment, O'Hare and Stewart conspired and made intentional material misrepresentations concerning their work at those organizations, defrauding the companies of hundreds of thousands of dollars, surreptitiously relocated Engeneration, and illegally monitored the communications of other management and officers of the various entities for the purpose of corporate espionage. In addition to themselves, O'Hare and Stewart utilized two lower conspirators in their conspiracy of corporate thuggery.

12. B. Stewart is Stewart's son and was a former Human Resources Manager at Vulcan AMPS. B. Stewart was terminated on June 17, 2004.

13. Gosselin is Stewart's nephew and was a former IT Manager at Vulcan AMPS. Gosselin resigned on Monday June 21, 2004.

14. B. Stewart and Gosselin were part of the conspiracy headed by O'Hare and Stewart to defraud Plaintiffs. HRS is a company owned by Mr. Stewart allegedly to perform Human Resources services.

### *O'Hare and Stewart are introduced*

15. During February 2001, Enron North America Corp. ("Enron") took ownership of North Carolina Power Holding, LLC ("NCPH"). NCPH is a holding company that owns Lumberton Power, LLC and Elizabethtown Power, LLC. Lumberton Power, LLC owns an electrical power generation plant located in Lumberton, North Carolina, and Elizabethtown Power, LLC owns an electrical power generation plant located in Elizabethtown, North Carolina.

16. After acquiring NCPH, Enron entered into a contract with GLC Consulting Services, Inc. ("GLC"), a Florida corporation owned and operated by Gerald L. Campbell. Under this agreement, GLC agreed to operate and maintain both the Lumberton power plant and the Elizabethtown power plant.

17. In April 2001, GLC applied to the Bank of Hiawassee for a loan of $500,000. The bank agreed to make the requested loan to GLC, but required GLC to prepare a formal business plan as a part of the loan application.

18. The bank suggested that GLC retain Defendant Stewart to assist with the preparation of a business plan.

19. At the bank's suggestion GLC retained Defendant Stewart to assist with the preparation of a business plan.

20. GLC paid Defendant Stewart, by check, wire transfer or similar means, for the work he performed. GLC paid Defendant Stewart at a rate that was equal to, or greater than, prevailing market rates for comparable work.

21. In addition, as part of the loan, the bank suggested that GLC revise its accounting practices. Defendant Stewart recommended to GLC that it retain Defendant O'Hare to assist with bookkeeping and accounting matters. On recommendation of Defendant Stewart, GLC retained Defendant O'Hare to manage the financial affairs of GLC.

22. Defendant O'Hare was given the duties of chief financial officer of GLC. Defendant O'Hare's duties included inspecting and approving or rejecting invoices; signing checks; managing cash flow; managing bookkeeping, financial recordkeeping and accounting functions; and managing tax matters.

23. GLC paid Defendant O'Hare, by check, wire transfer or similar means, for the work he performed. GLC paid Defendant O'Hare at a rate which was equal to or greater than prevailing market rates for comparable work.

24. Further, Defendant Stewart recommended to GLC that it revise and outsource human relations and information technology functions related to the operation of the Lumberton and Elizabethtown power plants. At the suggestion of and on the recommendation of Defendant Stewart, GLC retained Defendant HRS, a company solely or principally owned by Defendant Stewart, to provide human relations and information technology functions related to the operation of the Lumberton and Elizabethtown power plants.

25. GLC paid Defendant HRS by check, wire transfer or similar means, for the work he performed. GLC paid Defendant HRS at a rate which was equal to or greater than prevailing market rates for comparable services.

## *Engeneration is formed*

26. In the fall of 2001, Mr. Campbell formed Plaintiff, Engeneration, LLC, Plaintiff herein, and transferred the assets and liabilities of GLC to Engeneration.

27. At the time Engeneration was formed and at the insistence of Defendants O'Hare and Stewart, Defendants O'Hare and Stewart were given, as a gift, membership interest in Engeneration. Specifically, Mr. Campbell gifted 5% of the membership interest in Engeneration

PLAINTIFFS' ORIGINAL COMPLAINT                                    Page 5 of 20

Case 7:06-cv-00108-BR   Document 1   Filed 07/20/06   Page 5 of 20

to Defendant O'Hare and gifted 5% of the membership interest in Engeneration to Defendant Stewart.

28. The operating agreement, which governs the management of Engeneration, provides for a board of directors and for company officers: president, vice-president, secretary, and treasurer.

29. In addition to requesting and receiving a gift of membership interest in Engeneration, Defendants O'Hare and Stewart requested and received seats on the board of directors and assignments as company officers. Defendant O'Hare served as a member of the board of directors and as Treasurer. Defendant Stewart served as a member of the board of directors and as Vice-President.

30. Engeneration employed Defendant O'Hare as its chief financial officer. Defendant O'Hare's duties included inspecting and approving or rejecting invoices; signing checks; managing cash flow; managing bookkeeping; financial recordkeeping and accounting functions; and managing tax matters.

31. After forming Engeneration, Mr. Campbell directed Defendant O'Hare to wind up the affairs of GLC and to dissolve GLC.

32. GLC assigned its contract with Enron to Engeneration, and Engeneration operated and maintained the Lumberton and Elizabethtown power plants under contract with Enron. Defendant HRS continued to provide human relations and information technology services to Engeneration in connection with the operation of the Lumberton and Elizabethtown power plants.

33. In late 2002, Plaintiffs O'Hare and Stewart caused, through their ownership interests, the state of formation of Engeneration to be relocated from Georgia to Texas. Altering Engeneration

from a Georgia L.L.C. to a Texas L.L.C. was done without the knowledge or consent of the majority interest holder, Gerald L. Campbell.

34. In April or May 2003, AIG Highstar, Inc. ("AIG"), who had purchased NCPH from Enron, began discussing with Mr. Campbell the possibility that AIG would either sell the Lumberton and Elizabethtown power plants to him or would close the plants.

35. Mr. Campbell consulted with Defendant O'Hare about purchasing the power plants. In May of 2003 Defendant O'Hare had served as chief financial officer for both power plants (through either GLC or Engeneration) for approximately 2 years and was, or should have been, intimately familiar with the profitability and continued viability of both power plants. Defendant O'Hare assured Mr. Campbell that the power plants had made money in the past and would make money or be profitable in the future.

36. Mr. Campbell was interested in purchasing the Lumberton and Elizabethtown power plants; however, he could not obtain a line of credit sufficiently large to continue operations of the plants.

37. In August of 2002, Mr. Campbell, through his company TDF, and his new business partners, Vulcan Capital, L.L.C. formed an investment engine named Vulcan Power Group, LLC ("VPG"). At the outset, VPG was co-owned by two members, TDF and Vulcan Capital, L.L.C. Mr. Campbell has been the majority shareholder of TDF since its inception. In October 2003, VPG bought NCPH (including Lumberton Power, LLC and Elizabethtown Power, LLC) from AIG.

38. As before, Engeneration continued to operate and maintain both the Elizabethtown and the Lumberton power plants and Defendant HRS continued to provide human relations and

information technology services to Engeneration in connection with the operation of the Lumberton and Elizabethtown power plants.

39. At all times relevant to this civil action Defendants O'Hare and Stewart were members, officers, managers and/or directors of Plaintiffs.

40. At all times relevant to this civil action, Defendant B. Stewart was employed by Engeneration.

41. At all times relevant to this civil action Defendants O'Hare and Stewart owed a fiduciary duty to Plaintiffs.

### *Vulcan AMPS and Mpower come together*

42. In the summer of 2002, Mr. Campbell became aware that the trustee administering Enron's bankruptcy estate was selling a subsidiary of Enron, Applied Mobile Power Services. Mr. Campbell was familiar with the mobile power service technology owned by the subsidiary of Enron and concluded that purchasing the division from Enron could be both complementary to the work of Engeneration and profitable. However, Mr. Campbell lacked the capital necessary to complete the purchase, to fully develop the technology, and to market the technology.

43. In the fall of 2002, VPG purchased advanced mobile power systems from Enron's bankruptcy estate.

44. VPG transferred the assets it purchased first to a facility in Florida and later to a facility in Elizabethtown, North Carolina and began developing and marketing the technology.

45. In connection with the purchase of the mobile power services Mr. Campbell caused Mpower to be formed. Mpower was formed to provide accounting, staffing, human relations, information technology, and other operational support for VPG's efforts to develop the mobile power service technology.

46. At the time Mpower was formed and at the insistence of Defendants O'Hare and Stewart, Defendants O'Hare and Stewart were given, as a gift, membership interest in Mpower. Specifically, Mr. Campbell gifted 33% of the membership interest in Mpower to Defendant O'Hare and gifted 33% of the membership interest in Mpower to Defendant Stewart.

47. The operating agreement that governs the management of Mpower provides for a board of directors and for company officers: president, vice-president, secretary, and treasurer.

48. In addition to requesting and receiving a gift of membership interest in Mpower, Defendants O'Hare and Stewart requested and received seats on the board of directors and assignments as company officers. Defendant O'Hare served as a member of the board of directors and as President and Chief Financial Officer. Defendant Stewart served as a member of the board of directors and as Chief Administrative Officer.

49. Mpower employed Defendant O'Hare as its chief financial officer. Defendant O'Hare's duties included inspecting and approving or rejecting invoices; signing checks; managing cash flow; managing bookkeeping; financial recordkeeping and accounting functions; and managing tax matters.

50. Mpower retained Defendant HRS to provided human relations and information technology services to Mpower.

51. At all times relevant to this civil action Defendants O'Hare and Stewart owed a fiduciary duty to Mpower and to the other members of Mpower.

*Conspiracy of fraud and deceit*

52. Stewart and O'Hare's pattern of fraud, deceit and theft was pervasive throughout 2003-2004, encompassing and damaging in some manner all of the Plaintiff companies. Through his position with two other companies that did contract work for Vulcan AMPS, Mpower and

Engeneration, O'Hare would approve false invoices from Defendant HRS, a company owned by Stewart and phony reimbursement requests for travel expenses. These inflated Mpower and Engeneration bills were then passed on to Vulcan AMPS as part of an expense reimbursement agreement between Vulcan AMPS and Mpower and Engeneration. Upon information and belief, O'Hare and Stewart would then embezzle the excess funds from Mpower and Engeneration.

53. Defendant Stewart has, *inter alia*:

   a) caused Defendant HRS to submit invoices at a rate which exceeds by as much as ten times the customary and market rate for similar services;

   b) caused Defendant HRS to submit invoices for work which was not performed;

   c) caused Defendant HRS to submit invoices for expenses which were not incurred;

   d) failed to perform duties and to cause Defendant HRS to perform adequately; and

   e) other matters to be proven at trial.

54. Defendant HRS engaged in, participated in or received the benefits of Defendant Stewart's actions that are described above.

55. Defendant O'Hare has, *inter alia*:

   a) wrongfully authorized payment for or made payment for the fraudulent and wrongful invoices and reimbursement requests of Defendant HRS, Defendant Stewart, Defendant B. Stewart, Defendant O'Hare and others;

   b) submitted fraudulent reimbursement requests and authorized payment to or made payment to himself in connection with such fraudulent reimbursement requests;

   c) failed to manage tax matters adequately;

   d) misrepresented the value and profitability of the power plants; and

   e) other matters to be proven at trial.

56. When Stewart was terminated on June 17, 2004, B. Stewart was also terminated. On that same day, a hard copy of the quality assurance/quality control ("QAQC") documents for the Vulcan AMPS mobile generators which had been in B. Stewart's offices disappeared.

57. After Gosselin resigned the following Monday, it was discovered that the hard drive containing the QAQC manuals was also missing. As Network Administrator, Gosselin would have had access to the missing hard drive. These were the only copies of the QAQC manuals and are critical to Vulcan AMPS' business. Although Defendants initially denied having taken these items they subsequently returned the hard drive which contained the QAQC manuals.

58. After Gosselin's resignation, it was also discovered that he had attempted to erase the hard drive on company computers and the main server. It was also after Gosselin resigned that Plaintiffs discovered that high level management's e-mails had been systematically copied and rerouted to the e-mail accounts of Defendants, in direct opposition to company policy.

59. Vulcan AMPS issued Blackberries to O'Hare and Stewart for use in their employment. These Blackberries were never returned after Defendants O'Hare and Stewart were fired.

60. Furthermore, when Defendants left the companies, they wrongfully took the corporate records of TDF. Though requested, these records have never been returned to the shareholders and managers of the company.

### D. CAUSES OF ACTION

*Conversion*

61. The allegations in paragraphs 1 through 60 are incorporated herein by reference for all purposes as if fully stated.

62. Michael Stewart, O'Hare, B. Stewart, Gosselin and HRS acted individually or in concert and without authorization from Vulcan AMPS, assumed and exercised the right of ownership over Vulcan AMPS' QAQC manuals, a hard drive containing a copy of the QAQC manual and

other computer equipment to the exclusion of Vulcan AMPS exclusive ownership rights to those items.

63. Vulcan AMPS seeks actual damages that it may prove at trial, pre and post judgment interest, and, as Defendants' conduct was caused maliciously, willfully and wantonly with the intent to harm Vulcan AMPS, punitive and exemplary damages in an amount to be determined at trial.

### *Larceny By Employee*

64. The allegations in paragraphs 1 through 60 are incorporated herein by reference for all purposes as if fully stated.

65. Stewart, O'Hare and HRS were employees of Plaintiffs. Plaintiffs entrusted company assets to Defendants, including, without limitation, the control of Plaintiffs banking accounts.

66. Working individually and in concert, through a series of fraudulent invoices, expenses, and abuse of their positions within the companies, Defendants embezzled over $230,000.00 from Plaintiffs.

67. Stewart and O'Hare acted with the intent to steal the funds, with the intent to defraud Plaintiffs or both.

68. Stewart and O'Hare's wrongful submission of fraudulent invoices, fraudulent reimbursement requests or both, together with their acceptance of payments from Plaintiffs for these wrongful invoices constitutes a violation of N.C. Gen. Stat §14-74.

69. Plaintiffs seek actual damages they may prove at trial, pre and post judgment interest and as Defendants' conduct was caused maliciously, willfully and wantonly with intent to harm Plaintiffs, punitive and exemplary damages in an amount to be determined at trial.

70. Plaintiffs have been damaged by O'Hare and Stewart's activities in an amount that exceeds $10,000.00 and pursuant to N.C. Gen. Stat. §1-38.2 they are liable to Plaintiffs therefore.

## *Fraud*

71. The allegations in paragraph 1 through 60 are incorporated herein by reference for all purposes as if fully stated.

72. Defendants misrepresented to Plaintiffs that monies were owed to Defendants. Defendant O'Hare was the CFO and he submitted invoices he knew to be unauthorized during 2003-2004. In his capacity as CFO, he wrongfully paid himself for these invoices.

73. Likewise, in the same time frame, Defendants Stewart, B. Stewart and Gosselin submitted invoices they knew to be false and unauthorized. Defendants, in their capacity with the Plaintiffs, conspired and obtained unauthorized payment for those invoices.

74. During 2003 and 2004, Defendant HRS intentionally over billed Plaintiffs. Defendants in their capacity with the Plaintiffs, all knew that HRS had over billed and conspired and obtained improper payment for those invoices. The payments inured to the benefit of Stewart, owner of HRS, and perhaps to the other Defendants as well.

75. Defendant O'Hare was the CFO, and when he and the other Defendants left the companies, they absconded with the financial records. What facts are stated here and below have had to be pieced together from various sources. Thus, some figures are stated largely without the entire picture of transactions at Plaintiffs' disposal with which to levy these charges, but to the best of Plaintiffs current knowledge.

76. Defendants, submitted and paid the following false and unauthorized invoice amounts, allegedly for salaries, travel and expense reimbursements, *per diems*, contract fees, and other fees amounting to at least:

| Defendants | | |
|---|---|---|
| O'Hare | $105,000.00 to Mpower | $31,000.00 (possibly as much as $70,000.00) |

|  | $29,000.00 to Engeneration<br>$9,500.00 travel & expense to Mpower<br>$6,300.00 *per diem* to Mpower | $9,500.00 travel & expense<br>$6,300.00 *per diem* |
| --- | --- | --- |
| Stewart | $27,000.00 personal expenses to Plaintiffs | Unsure as to exact amount |
| B. Stewart | $1,900.00 personal expenses to Plaintiffs | Unsure as to exact amount |
| Gosselin | $3,300.00 personal expenses to Plaintiffs | Unsure as to exact amount |
| HRS | $105,000.00 to Mpower, Engeneration, TDF, and Vulcan Amps | $225,000.00 (possibly as much as $260,000.00) |

77. On information and belief, Plaintiffs believe that from January 2003 through June 2004, Defendant O'Hare fraudulently and intentionally paid unauthorized and over stated bills to currently unknown recipients, but whom Plaintiffs believe to be Defendants HRS, Stewart, B. Stewart and Gosselin, totaling $62,052.84. Plaintiffs believe the recipients of these monies knew that the payments were fraudulent and intended to deceive Plaintiffs in their collection.

78. Additionally, Stewart allowed Vulcan Amps to pay bills from HRS, which he knew were inflated and included improper charges. Upon information and belief, O'Hare and Stewart would then embezzle the excess funds from these contractors.

79. Defendants' statements of fact about the amounts of money owed by Plaintiffs to Defendants were false.

80. At the time Defendants made said representations of material fact to Plaintiffs, Defendants were aware that such statements were false and were reasonably calculated to deceive Plaintiffs.

81. Defendants made these statements with the intent to deceive Plaintiffs and with the intent to induce Plaintiffs to make payments to Defendants.

82. Plaintiffs relied on Defendants' misrepresentations and were in fact deceived by these misrepresentations. As a result of Plaintiffs' reasonable reliance on Defendants' statements, Plaintiffs have been damaged.

83. Vulcan Amps, Mpower, Engeneration and TDF seek actual damages that they may prove at trial, pre and post judgment interest, and as Defendants' conduct was caused maliciously, willfully and wantonly with intent to harm Plaintiffs, punitive and exemplary damages in an amount to be determined at trial.

### *Constructive Fraud*

84. The allegations in paragraphs 1 through 60 are incorporated herein by reference for all purposes as if fully stated.

85. At all times relevant to this action, Defendants acted as employees, officers or directors of Plaintiffs.

86. As officers or directors of Plaintiffs, Defendants occupied positions of trust and confidence vis-à-vis Plaintiffs. As officers and directors of Plaintiffs, Defendants owed Plaintiffs a fiduciary duty to act in Plaintiffs' best interest.

87. The relationship described in paragraphs 29, 30, 47, 49 and 50 above imposed upon Defendants the duty to exercise the utmost good faith in dealing with Plaintiffs.

88. As described more particularly above, Defendants failed to disclose material facts regarding the amounts owed to them and misrepresented material facts regarding amounts owed to them.

89. Defendants' failure to disclose certain material facts and misrepresentations of certain material facts constitutes constructive fraud.

90. Plaintiffs were injured as a direct and proximate result of Defendants' statements, acts, and omissions.

## *Breach of Fiduciary Duty*

91. The allegations in paragraphs 1 through 60 are incorporated herein by reference for all purposes as if fully stated.

92. In their capacities as members of the Board of Vulcan AMPS, Mpower, Engeneration and TDF, and as officers of Vulcan AMPS, Mpower, Engeneration and TDF, Stewart and O'Hare owed the Plaintiffs fiduciary duties. In addition to committing the frauds alleged in paragraphs 71-83 of this Complaint, Defendants breached their fiduciary duties to Plaintiffs in the manner explained below.

93. Stewart and O'Hare breached their fiduciary duty to Plaintiffs by allowing Plaintiffs to pay invoices from HRS, which Stewart and O'Hare knew were phony and inflated for their own personal benefit.

94. Stewart also breached this duty by misrepresenting the compensation that he and O'Hare were entitled to receive.

95. O'Hare also breached this duty by withholding the circumstances under which he left AIG from his employers and by allowing Vulcan AMPS to pay bills from subcontractors which he knew to be false and for his own personal benefit.

96. Stewart and O'Hare breached their fiduciary duty by absconding with Vulcan AMPS' QAQC manuals and fraudulently obtaining inter-office communications by upper management for improper purpose. Plaintiffs were damaged as a result of these breaches.

97. Plaintiffs seek actual damages that it may prove at trial, pre and post judgment interest, and as Defendants' conduct was caused maliciously with intent to harm Vulcan AMPS,

Engeneration and Mpower, punitive and exemplary damages in an amount to be determined at trial.

## *Violation of the Computer Fraud and Abuse Act*

98. The allegations in paragraph 1 through 60 are incorporated herein by reference for all purposes as if fully stated.

99. Stewart, O'Hare, B. Stewart, through the facilitation of Gosselin, intentionally accessed Vulcan AMPS' computers without authorization, exceeded their authorized access and obtained information from Vulcan AMPS' computer which were involved in interstate or foreign communication.

100. Defendants took these actions knowingly, with the intent to defraud, by accessing a protected computer without authorization or exceeding their authorized access.

101. This intentional access of a protected computer caused damages to Vulcan AMPS over $5,000.00.

102. Vulcan AMPS seeks actual damages that they may prove at trial, pre and post judgment interest, and as Defendants' conduct was caused maliciously, willfully and wantonly with intent to harm Plaintiffs, punitive and exemplary damages in an amount to be determined at trial.

## *Violations of the Electronic Communications Privacy Act*

103. Plaintiffs adopt and incorporate herein by reference the allegations in Paragraphs 1 through 60 above.

104. During the course of his employment by Plaintiffs, Gosselin, at the direction of Stewart and O'Hare, intentionally intercepted electronic communications sent by Plaintiffs' officers and employees, forwarding them to Stewart and O'Hare in violation of The Wiretap Act and/or The Stored Communications Act.

PLAINTIFFS' ORIGINAL COMPLAINT                                                                                    Page 17 of 20

Case 7:06-cv-00108-BR   Document 1   Filed 07/20/06   Page 17 of 20

105. Defendants have been damaged by these interceptions in the greater of the sum of the actual damages suffered by Plaintiffs and any profits made by Defendants as a result of these interceptions, or statutory damages for $100 per day for each day of the violation, or $10,000.

106. Because of the circumstances of these interceptions, this is an appropriate case for an award of punitive damages under the Electronic Communications Privacy Act, as well as reasonable attorneys' fees and court costs.

## *Unfair and Deceptive Trade Practices*

107. Plaintiffs adopt and incorporate herein by reference the allegations in Paragraphs 1 through 60 above.

108. As described more fully above, Defendants have willfully engaged in unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes.

109. Defendants acts were in or affected commerce.

110. As a direct and proximate result of Defendants' unfair and deceptive acts, Plaintiffs have been damaged in excess of $10,000 exclusive of costs and interest.

111. Plaintiffs are entitled to recover treble damages for injuries caused by the aforesaid conduct, plus attorneys' fees and the cost of prosecuting this action.

## *Civil Conspiracy*

112. The allegations in paragraph 1 through 60 are incorporated herein by reference for all purposes as if fully stated.

113. Stewart, O'Hare, B. Stewart, Gosselin and HRS agreed to misrepresent material facts concerning the employment of Michael Stewart and O'Hare at Vulcan AMPS, absconded with property belonging to Vulcan AMPS, profited from O'Hare's approval of invoices he knew to be false, violating the fiduciary duties O'Hare owed to Plaintiffs.

114. The actions of these conspirators caused injury to Vulcan AMPS, Engeneration, Mpower and TDF. Stewart, O'Hare, B. Stewart, Gosselin and HRS acted pursuant to a common scheme to defraud and injure Plaintiffs' business for their own personal gain.

115. Plaintiffs seek actual damages that they may prove at trial, pre and post judgment interest, and as Defendants' conduct was caused maliciously, willfully and wantonly with intent to harm Plaintiffs, punitive and exemplary damages in an amount to be determined at trial.

### E. JURY DEMAND

116. Demand for a jury is hereby made, and the appropriate fee is tendered to the Clerk contemporaneously with the filing of this pleading.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek from this Court the following:

1. An award of monetary damages against Defendants that include, but are not limited to, actual damages that may be proven at trial, consequential damages, and punitive damages.

2. Plaintiffs' attorney's fees, including pre and post judgment interest and other costs of court; and

3. All such other and further relief, general and special, either at law or in equity, to which Plaintiffs are lawfully entitled.

Respectfully submitted,

GODWIN PAPPAS LANGLEY RONQUILLO, L.L.P.

By: _____
Rick L. Lambert
Texas State Bar No. 11844725
William Lewis Sessions
Texas State Bar No. 18041500

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2084
Telephone: 214.939.4400
Facsimile: 214.527.3148


MORRIS, MANNING & MARTIN, LLP

BY: _____
Keith Burns
North Carolina State Bar No. 19852

**LR 83.1 Attorneys for Plaintiffs**
Post Office Box 12768
1000 Park 40 Plaza
Suite 350
Research Triangle Park, NC 27709
Telephone: (919) 806-2969


**ATTORNEYS FOR VULCAN ADVANCED MOBILE POWER SYSTEMS L.L.C., TDF & COAL, INC., ENGENERATION OPERATING SYSTEMS, L.L.C. AND TEXAS MPOWER, L.L.C.**